IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 3:16-cr-44 |
| v. | : | JUDGE WALTER H. RICE |
| JAMES L. WRIGHT, | : | |
| Defendant. | : | |

---

DECISION AND ENTRY OVERRULING MOTION TO SUPPRESS OF DEFENDANT JAMES L. WRIGHT (DOC. #52); ALL STATEMENTS, DOCUMENTS, AND INFORMATION PRODUCED BY DEFENDANT TO THE INTERNAL REVENUE SERVICE AFTER NOVEMBER 2, 2010, MAY BE USED BY PLAINTIFF UNITED STATES OF AMERICA AGAINST DEFENDANT AT TRIAL

---

Defendant James L. Wright ("Defendant" or "Wright") was indicted by a Grand Jury for the Southern District of Ohio on March 22, 2016, on one count of engaging in a corrupt endeavor to obstruct and impede the Internal Revenue Service ("IRS"), two counts of aiding and assisting in the filing of false tax returns, and five counts of filing false tax returns. Doc. #3; Doc. #9. The factual basis for the original Indictment (and later, the Superseding Indictment) arose out of an IRS audit of the B&P Company, Inc. ("B&P"), a corporation owned or controlled by Wright, which began in or about June 2010 as a civil audit, but became a criminal investigation of Wright himself beginning in or about March 2011. Between June 2010 and March 2011, Wright made statements to IRS Revenue Agent ("RA") Rebecca Bettelon ("Bettelon") and Bettelon's group manager, Steve Rowe ("Rowe"), in connection with the B&P audit. Wright also

produced documents regarding B&P, The Remnant, Inc. ("Remnant"), another company owned and controlled by Wright, and the Wright Family Limited Partnership ("WFLP"), a legal entity in which the IRS suspected that Wright was a member. Wright has filed a Motion to Suppress Evidence ("Motion"), Doc. #52, arguing that the civil audit of B&P was a disguised criminal investigation of him from the start, and that all statements, documents and information obtained by the IRS from Wright on or after November 2, 2010, were obtained in violation of his rights under the Fourth and Fifth Amendments to the United States Constitution. For the reasons set forth below, Wright's Motion is OVERRULED.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On or about August 6, 1997, Wright was indicted by a Grand Jury in the Southern District of Ohio on three counts of attempted tax evasion. No. 1:97-cr-64, Doc. #1. On or about September 17, 1998, Wright pled guilty to count one of the indictment, *id*., Doc. #71, and on or about July 30, 1999, Wright was sentenced to a probationary term of five years and ordered to pay "restitution in the amount of taxes determined by the [IRS] to be owing and a special assessment of $50.00. Both shall be due immediately." *Id.*, Doc. #87, PAGEID #15. However, the amount of restitution was never reduced to judgment, and Wright's probationary period expired on July 30, 2004.

On or about June 17, 2010, Bettelon mailed IRS Letter 2205-B, a notice of audit for businesses, to B&P, regarding its corporate tax return for tax year 2007. Doc. #52-3, PAGEID #456. After Wright informed Bettelon that he was the responsible person and corporate agent for B&P, *id*., RA Patrick Ruetschle ("Ruetschle") sent B&P an

Information Document Request ("IDR 1") on June 21, 2010. Doc. #52-4, PAGEID #460-61. Bettelon conducted interviews with Wright on August 13, 2010, and again on October 8, 2010, as to B&P. Doc. #52-3, PAGEID #456-57. On August 27, 2010, Bettelon conducted a Manager Concurrence Meeting with Rowe, who informed Bettelon that Wright "owe[d] over $400,000 related to past tax years," and that there were discrepancies on B&P's Form 1120 for tax year 2006. Doc. #52-6, PAGEID #471. Rowe stated that the IRS Collection Department was attempting to collect on the above tax delinquency, and instructed Bettelon to "[k]eep in touch with [the revenue officer] to discuss collectability issues." *Id.*

On November 2, 2010, Bettelon discussed her audit with Merrill Fromer ("Fromer"), the IRS's Fraud Technical Advisor ("FTA") for the Dayton, Ohio, area. Specifically, Bettelon "[s]poke with FTA Fromer about possible indicators of fraud, with all the related entities." Doc. #52-3, PAGEID #457. Bettelon subsequently prepared and forwarded to Rowe a Form 13680, which allows RAs to "request research using the yK1 Link Analysis Tool. This tool provides a graphic representation of flow-through relationships created by partnerships, trusts, and S corporations. The tool uses Schedule K-1 data to depict ownership relationships and income/loss flows between payers and payees." INTERNAL REVENUE MANUAL ("IRM" or "MANUAL") § 4.10.4.3.4.3(5) (Aug. 9, 2011). On November 17, 2010, Bettelon again met with Wright, and asked him "if he or [B&P] had ever been involved with any prior audits or dealings with the IRS." Doc. #52-3, PAGEID #457. Bettelon claims that in response, "Wright stated [that] he has [*sic*] never been involved with the IRS prior to my visit" on August 13, 2010. *Id.* Wright denies having ever made such a statement.

3

On January 19, 2011, Bettelon and Rowe conducted another interview with Wright, at which time Bettelon informed Wright that "she just needed copies of the credit card statements" that were requested in the IDRs; Doc. #52-3, PAGEID #457; Bettelon received those statements from Wright on February 24, 2011. *Id.*, PAGEID #458. On February 8, 2011, Bettelon and Rowe discussed the case with Fromer, who instructed her to prepare Form 11661: Fraud Development Recommendation - Examination. *Id.* In that form, Bettelon listed several indicators of fraud, including:

1. Wright and B&P's use of a "tiered scheme," by which Wright was diverting B&P's "substantial profits . . . to other tiers. These tiers eliminate taxable income through the deduction of personal expenses.";

2. Family members charging personal expenses to B&P credit cards, and deducting those personal expenses as business expenses; and

3. Wright had obtained advice on the tiered scheme from Omega Tax Planning, the principal of which, Richard Parris, had been convicted of tax fraud for promoting such a scheme.

Doc. #55-1, PAGEID #629. Bettelon calculated that, through the above-described actions, B&P had underpaid its tax liability more than $600,000 for tax years 2007, 2008 and 2009. *Id.* Concerned that the statute of limitations would expire for the IRS's attempts to assess additional liability for tax year 2007, on March 17, 2011, Bettelon mailed to Wright Form 872: Consent to Extend the Time to Assess Tax. Doc. #52-3, PAGEID #458. On March 24, 2011, at the direction of Rowe and Fromer, Bettelon prepared Form 2797: Referral Report of Potential Criminal Fraud. *Id.* By completing Form 2797, Bettelon was informing IRS Criminal Investigation ("IRS-CI") that there existed firm indicators of fraud as to B&P, Remnant and Wright, such that a criminal investigation was warranted. INTERNAL REVENUE MANUAL § 25.1.3.2(1). Upon completing the form, Bettelon was required to "**suspend** the examination/collection

4

activity without disclosing to the taxpayer or representative the reason for the suspension." *Id.* (emphasis in original).

On March 29, 2011, Bettelon called Wright and asked him whether he was agreeable to signing Form 872. Wright indicated that he would not sign it, and asked for an update on the status of his audit. Bettelon replied that Rowe needed to review the credit card statements that Wright had sent to Bettelon, but that Rowe was on sick leave and had not had a chance to review them. Doc. #52-3, PAGEID #458. In her Examining Officer's Activity Record ("EOAR") for the B&P audit, Bettelon wrote that she was "postponing telling [Wright] any information regarding the criminal investigation." *Id.* Bettelon made a similar note in her EOAR after a conversation with Wright on May 5, 2011, as IRS-CI had not yet accepted the audit transfer requested via Form 2797. *Id.; see also* INTERNAL REVENUE MANUAL § 25.1.3.3-4 (IRS-CI's process for evaluating and accepting a criminal referral). On June 2, 2011, Bettelon met IRS-CI Agents Tony Westendorf ("Westendorf") and Thomas Buchenroth ("Buchenroth") to discuss the B&P audit and her reasons for referral. *Id.* On June 7, 9, 10, and 22, 2011, Wright called Bettelon to inquire about the status of the civil audit; Bettelon did not return the calls. *Id.* On June 24, 2011, Bettelon talked to Rowe about Wright's "many phone calls . . . and the fact that she was running out of things to postpone" returning his calls. *Id.* That same day, Rowe called Wright and informed him that Bettelon was no longer working on the audit, and that the case had been transferred to IRS-CI. *Id.*

On March 22, 2016, the Grand Jury for the Southern District of Ohio issued its original Indictment. As to Count One—Corrupt Endeavor to Obstruct and Impede the Due Administration of the Internal Revenue Laws, in violation of 26 U.S.C. § 7212(a)—

5

the Grand Jury alleged that Wright had "[f]alsely stat[ed] to an IRS revenue agent that he had no prior dealings with the IRS, when in fact, the IRS had investigated Wright for tax evasion and [had] audited The Remnant[.]" Doc. #3, ¶ 13i, PAGEID #14. On April 11, 2017, the Grand Jury issued a Superseding Indictment. Doc. #39. On May 15, 2017, Wright filed the instant Motion, and an evidentiary hearing was held on the matter over four days between June 8 and August 1, 2017. In his post-hearing brief, Wright narrowed his requested relief to the suppression of any statement made and document or information produced by Wright to Bettelon, Rowe or Fromer after November 2, 2010. Doc. #61, PAGEID #695-96.

## II. LEGAL STANDARD

The Fourth Amendment to the United States Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. AM. IV. The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. AM. V. The right against self-incrimination has long been held to bar the compelled production "of a man's private books and papers to be used in evidence against him[.]" *Boyd v. United States*, 116 U.S. 616, 633, 6 S.Ct. 524, 29 L.Ed. 746 (1886), *rejected on other grounds by Warden, Maryland Penitentiary v. Hayden*, 367 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Courts of Appeal have consistently held that an IRS criminal investigation conducted under the guise of a civil audit violates a defendant's Fourth and Fifth Amendment rights. *See, e.g., U.S. v. McKee*, 192 F.3d 535, 541-42

6

n.5 (6th Cir. 1999); *U.S. v. Powell*, 835 F.2d 1095, 1100 (5th Cir. 1988); *U.S. v. Tweel*, 550 F.2d 297, 300 (5th Cir. 1977)). Courts have recognized that "[s]ignificantly different rights, responsibilities, and expectations apply to civil audits and criminal tax investigations[, and it] would be a flagrant disregard of individuals' rights to deliberately deceive, or even lull, taxpayers into incriminating themselves during an audit when activities of an obviously criminal nature are under investigation." *U.S. v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993) (citing *Tweel*, 550 F.2d at 299). Thus, any statement made or document or information produced by a taxpayer under the guise of a civil audit must be suppressed as violating the Fourth and Fifth Amendments. *U.S. v. Peters*, 153 F.3d 445, 451-52 (7th Cir. 1998).

Yet, courts allow the IRS significant latitude in conducting audits, and the mere fact that evidence was obtained during a civil audit that provides the foundation to transform the audit into a criminal investigation is not sufficient to mandate the exclusion of that evidence. *See U.S. v. Madena*, 152 F.3d 831, 851 (8th Cir. 1998) ("[a] firm indication of fraud is different than an initial indication that fraud exists, and it is more than a mere suspicion of fraud."). Rather, at the very least, "firm indications of fraud" must have been identified by the RA before a civil audit can be considered to have transformed into a criminal investigation. *McKee*, 192 F.3d at 542 n.5; *Grunewald*, 987 F.2d at 534. Moreover, a defendant seeking to suppress evidence obtained during a civil audit must show "by clear and convincing evidence that: (1) the RA made affirmative misrepresentations in the course of her investigation, and (2) because of those misrepresentations, the defendant disclosed incriminating evidence to the

7

prejudice of his [C]onstitutional rights." *U.S. v. Rutherford*, 555 F.3d 190, 194 (6th Cir. 2009) (quoting *McKee*, 192 F.3d at 542).

III. **ANALYSIS**

   A. **Failure to Follow Internal Revenue Manual does not Mandate Suppression of any Evidence Obtained in Violation Thereof**

Wright argues that "[f]rom the outset, the IRS's audit of the B&P Company was an illicit and unconstitutional ruse devised to trick and deceive Wright into providing incriminating documents, information, and personal statements in service of an ongoing IRS criminal investigation." Doc. #52-1, PAGEID #419. He claims that Bettelon was coached by Rowe, Fromer, Buchenroth and Westendorf to obtain statements from Wright that would tend to incriminate him. *Id.* Wright takes issue with Bettelon's asking him, on November 17, 2010, about whether he had had any past dealings with the IRS. He argues that his answer to the question would have yielded no meaningful information with respect to the civil audit, but that Wright's lack of truthfulness could be used as an indicator of fraud for a criminal investigation. *Id.*, PAGEID #421 (citing Doc. #52-3, PAGEID #457). Most seriously, Wright claims, Bettelon continued the civil audit even after suspecting criminal activity and completing Forms 2797 and 11661, soliciting credit card statements from Wright, speaking with him via telephone, and attempting to persuade him to toll the statute of limitations as to the civil audit of B&P's tax year 2007. *Id.*, PAGEID #421-22 (citing Doc. #52-3, PAGEID #458; Doc. #52-7, PAGEID #74; Doc. #52-9, PAGEID #480). Wright's alleged statement from November 17, 2010, was a key element in the Government's allegation that he had violated 26 U.S.C. § 7212(a), Doc. #39, ¶ 16m, PAGEID #298, and the credit card statements Wright provided after

8

Bettelon completed From 11661 were used by the Government as evidence that Wright was using a tiered scheme to under-report income. Doc. #39, ¶ 11, PAGEID #295. Thus, Wright argues, that evidence should be suppressed as a violation of his Fourth and Fifth Amendment rights. Doc. #52-1, PAGEID #422.

The Government argues that Wright has not shown by clear and convincing evidence that: there was ever any overlap between the civil audit (Rowe, Bettelon, Fromer and Reutschle) and criminal investigation (Buchenroth and Westendorf); Bettelon made an affirmative misrepresentation to Wright as to the civil nature of her audit; or that Wright was prejudiced by any alleged misrepresentation made by Bettelon. Doc. #55, PAGEID #602-06. Thus, the Government argues, Wright has not established any constitutional violation, and none of the evidence obtained by Bettelon should be suppressed. *Id.*, PAGEID #610-11.

The parties agree that *Tweel* is the seminal case on the exclusionary rule's applicability to criminal proceedings arising out of IRS audits. Doc. #55, PAGEID #603. Nonetheless, the Government argues that *Tweel* presented a particularly egregious set of facts, in which the defendant, an accountant whose accounts were being audited, specifically asked the RA whether an IRS-CI special agent was involved. The RA responded that there was no such agent involved, despite the fact that the audit had been initiated "at the specific request of the Organized Crime and Racketeering Section of the Department of Justice." *Id.* (quoting *U.S. v. Tweel*, 550 F.2d 297, 298 (5th Cir. 1977)). Only after the defendant was told that a special agent was not involved with the audit did he turn over the documents that were later used to incriminate him. *Id.* (citing *Tweel*, 550 F.2d at 298). The *Tweel* Court found that the defendant's documents were

9

obtained solely as a result of the RA's affirmative deception, and thus, constituted an unreasonable search and seizure in violation of the Fourth Amendment, and "[t]he evidence obtained . . . in violation of appellant's Fourth Amendment rights, as well as any evidence derived therefrom, should have been suppressed." *Tweel*, 550 F.2d at 300.

The Government notes that the "shocking conduct by the IRS" in *Tweel* was an affirmative misrepresentation that induced detrimental reliance by the defendant, Doc. #55, PAGEID #603 (quoting *Tweel*, 550 F.2d at 300), and argues that it is only under such circumstances is suppression of evidence appropriate. *Id.*, PAGEID #606-07 (citing *U.S. v. Rutherford*, 555 F.3d 190, 194-96 (6th Cir. 2009)). The Government concedes that, in some instances, a violation of the Internal Revenue Manual by the IRS agent may meet the *Tweel* threshold. *Id.*, PAGEID #606 (citing *U.S. v. McKee*, 192 F.3d 535, 542 n.5 (6th Cir. 1999)). Yet, as the Government points out, "the issue of whether a violation of IRS policy is necessarily a violation of a defendant's constitutional rights was not before the [C]ourt in *McKee*." *Id.* (emphasis added) (citing *Rutherford*, 555 F.3d at 194). Indeed, such a firm rule would be contrary to the Supreme Court's holding that a violation of an IRS rule or policy does not automatically require suppression. *U.S. v. Caceres*, 440 U.S. 741, 755, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Thus, even if Bettelon's conduct after she was instructed to prepare Form 2797—asking Wright to toll the statute of limitations, and continuing to speak with him via telephone—violated the Manual, that violation does not, by itself, satisfy either element of the *Rutherford* test. Rather, Wright must show that the violation constituted an affirmative misrepresentation, and that he was prejudiced by such a violation.

10

As discussed above, Wright concedes that he has not demonstrated by clear and convincing evidence that Bettelon's audit had transformed into a disguised criminal investigation prior to November 2, 2010. Doc. #61, PAGEID #695. The timing of that concession is important, as the only statement allegedly made by Bettelon that comes close to an affirmative misrepresentation was her statement to Wright during her first site visit to B&P, on or about August 17, 2010, that "this [was] a routine audit." Doc. #52-1, PAGEID #406. Bettelon's visit was prior to her becoming aware of Wright's prior conviction and supposedly outstanding restitution order from said conviction, Hearing Tr. 114-15, 148, 485-86, 542-43, and thus, she had no reason to suspect that her audit would develop into a criminal investigation at the time she made the statement. Further, while Wright filed delinquent returns for Remnant and WFLP (which can be indicators of fraud), he did so on October 8 and 14, 2010, respectively—after Bettelon's first visit to B&P and Bettelon had consulted with Fromer. Doc. #52-3, PAGEID #457.

As discussed above, Wright argues that Bettelon's question on November 17, 2010, about his past interactions with the IRS was an affirmative misrepresentation. Doc. #52-1, PAGEID #420-21. Yet, even assuming that Bettelon, by asking the question, was hoping to catch Wright in a lie, which would in turn serve as an indicator of fraud, Wright has failed to prove by clear and convincing evidence that he was prejudiced by such deceit. At least one of Wright's past dealings with the IRS is a matter of public record, No. 1:97-cr-64, and Wright cannot reasonably claim that providing misinformation about a public record in the context of a civil audit was somehow appropriate in a way that providing such misinformation in the context of a criminal investigation would not be. Further, Bettelon's interview of Wright took place at

11

least two months before she completed Form 11661, Doc. #52-3, PAGEID #457; thus, any suspicions of criminal activity that Bettelon had at that time were not the firm indicators of fraud required to refer the case to IRS-CI.[1] The mere fact that Bettelon used that statement as an indicator of fraud in completing Form 11661 was not improper; as discussed above, it is neither inappropriate nor even uncommon for a civil audit to become a criminal investigation. *U.S. v. Wadena*, 152 F.3d 831, 851-52 (8th Cir. 1998). Thus, the allegedly false statement made by Wright to Bettelon on November 17, 2010, was not obtained in violation of Wright's Fourth and Fifth Amendment rights, and will not be suppressed.

As to Wright's production of credit card statements in February 2011, Bettelon and Rowe prepared four Information Document Requests during the civil audit of B&P, and two IDRs for Remnant. Doc. #52-3, PAGEID #456-57; Doc. #52-7, PAGEID #474. IDR 4 for B&P and IDR 2 for Remnant were sent to Wright on December 30, 2010, more than one month prior to Bettelon's preparation of Form 11661. Doc. #52-3, PAGEID #457; Doc. #52-7, PAGEID #474. On December 27, 2010, prior to sending IDR 4 for B&P, Bettelon "reviewed it with [Rowe] to ensure all documents were requested," Doc. #52-3, PAGEID #457—including, presumably, the credit card statements. During Rowe and Bettelon's interview with Wright on January 19, 2011,

---

[1] In his post-hearing surreply, Wright claims that Bettelon was aware of all the facts that she, Rowe and Fromer believed to be firm indicators of fraud no later than November 2, 2010, and that Bettelon was to have filed Form 11661 later that month. Thus, he argues, the fact that Bettelon did not complete that form until February 8, 2011, is immaterial for determining when the civil audit became a criminal investigation. Doc. #69, PAGEID #457. Yet, even after Bettelon returned from training in Philadelphia, Pennsylvania, she continued to request documents from Wright and attempt to reconcile the financial statements provided by Wright with B&P's tax returns. Doc. #52-3, PAGEID #457. Bettelon's records indicate that she was still developing the facts that led to her preparing Form 11661; certainly, if Rowe and Fromer had concluded that sufficient indicators of fraud were present in November 2010, then they could have instructed Bettelon to complete the form upon her return from training in December 2010. As discussed below, the IRS has broad discretion to determine when a civil audit becomes a criminal investigation, and Wright has not met his heavy burden of showing that such discretion was abused.

Wright told Bettelon that he would mail them to her once he finished collecting all of them. *Id.* It was almost three weeks later, on February 8, 2011, that Bettelon prepared Form 11661, in which she only referenced obtaining the credit card statements as part of her plan of action. Doc. #55-1, PAGEID #630. Bettelon received the credit card statements on February 24, 2011. Doc. #52-3, PAGEID #458. Even if the Court were to accept Wright's contention that the preparation of Form 11661 or 2797 was confirmation that there were firm indicators of fraud—and thus, the audit should have been suspended, INTERNAL REVENUE MANUAL § 25.1.3.2(1)—Bettelon's request for credit card statements were made long before she had developed those indicators. Accordingly, they were valid requests as part of an ongoing civil audit. As Bettelon made no misrepresentation to Wright, the credit card statements and any information derived therefrom shall not be suppressed.

Finally, Wright argues that the Government, by allowing Bettelon to speak with him, encouraging him to sign the Form 872, and subsequently attempting to "put off" further contact with him after she completed the Form 2797, violated his Fourth and Fifth Amendment rights. Doc. #52-1, PAGEID #422 (citing Doc. #52-3, PAGEID #458). Certainly, Bettelon's decision to ask Wright to toll the civil statute of limitations after she had already referred the case to IRS-CI was ill-advised. However, Wright did not sign the Form 872; in other words, even if Bettelon's request that he toll the statute of limitations constituted an affirmative misrepresentation, Wright took no action in reliance on that misrepresentation. Similarly, Bettelon's conversation with Wright on May 5, 2011, and Wright's subsequent, unreturned phone calls to Bettelon, did not prejudice Wright; Wright produced no evidence that he undertook any action with respect to the

13

B&P audit after refusing, on March 29, 2011, to toll the civil statute of limitations. Doc. #52-3, PAGEID #458. Thus, even assuming that Bettelon's refusal to disclose that she had referred the case to IRS-CI constituted misrepresentation by omission, the lack of prejudice means that the exclusionary rule does not apply.

### B. This Court's Analysis is Consistent with Statutes and Caselaw

In his post-hearing memorandum, Wright argues that a focus on when Forms 11661 and 2797 were completed ignores the more important question of when firm indicators of fraud were present. Doc. #61, PAGEID #699. As discussed above, he claims that on or after November 2, 2010, Bettelon, Rowe and Fromer began working with IRS-CI to obtain information on Omega and Parris to show that Wright knew that a tiered scheme was illegal. As that information was immaterial to the B&P audit, but highly pertinent in determining whether Wright could raise a "reasonable reliance" defense to criminal charges, he argues that this collaboration transformed the audit into a criminal investigation. *Id.*, PAGEID #700-01 (citing Tr. 396-97, 572-73; Doc. #61-2, PAGEID #709-10; Doc. #61-4, PAGEID #730; Doc. #61-6, PAGEID #741-43). Further, Bettelon testified that she only completed Form 11661 <u>after</u> firm indicators of fraud were present, and the indicators of fraud listed in that Form were identical to those listed in Form 2797. *Id.*, PAGEID #701-04 (citing Tr. 149-50, 561-73, 609; Doc. #61-2, Doc. #61-4, PAGEID #730; Doc. #61-7). The fact that Bettelon did not fill out the Form 11661 until February 8, 2011, is irrelevant for the purposes of determining when Wright's Fourth and Fifth Amendment rights were implicated—Bettelon's initial consultation with Fromer on November 2, 2010. Thus, Wright argues, any information,

14

documents or statements obtained by the IRS after that date should be suppressed. *Id.*, PAGEID #703-04.

Wright's argument is unsupported by caselaw and seems to ignore the process by which a civil audit transforms into a criminal investigation. As the Government notes, consultation with the FTA marks the beginning of the fraud development phase of an audit. Doc. #64, PAGEID #762-63 (citing Tr. 226, 529); *see also* INTERNAL REVENUE MANUAL § 25.1.1.1(7) ("[u]pon initial recognition of indicators of fraud, the employee will discuss the case at the earliest possible opportunity with his/her manager. If the compliance group manager concurs, the FTA will be contacted immediately[.]"). On November 2, 2010, Bettelon, Rowe and Fromer did not have a firm basis upon which to suspect that Wright had engaged in criminal activity, and it was not inevitable that they would refer the case to IRS-CI. Rather, it was only after further investigation revealed doubts about Wright's credibility and discrepancies in the documents produced in response to the IDRs that the preliminary indicators of fraud were confirmed as firm indicators, and only then did Bettelon prepare Form 11661 on February 8, 2011. *Id.*, PAGEID #757 (citing INTERNAL REVENUE MANUAL §§ 25.1.2.2(8); 25.1.3.2(1)). The determination of when a civil audit should be turned over to IRS-CI is fact-sensitive and within the broad discretion of the IRS. *See, e.g., U.S. v. Caldwell*, 820 F.2d 1395, 1402 (5th Cir. 1987) *Groder v. United States*, 816 F.2d 139, 142-43 (4th Cir. 1987). After hearing evidence on the matter, the Court concludes that this discretion was not abused with respect to Wright.

Accordingly, there was no criminal proceeding that would implicate Wright's Fourth or Fifth Amendment rights at the time Bettelon allegedly solicited the false

15

statement from Wright regarding his past dealings with the IRS. Nor were his Constitutional rights implicated at the time any IDR was transmitted. Thus, there was no misrepresentation—affirmative or otherwise—upon which Wright could have relied. Further, as discussed above, Wright took no action after Bettelon completed Form 11661 that was prejudicial to him. Thus, he has failed to satisfy the Sixth Circuit's standard for exclusion set forth in *U.S. v. Rutherford*, 555 F.3d 190 (6th Cir. 2009) as to <u>any</u> portion of the civil audit of B&P, and none of the statements, documents or information obtained by the Government in response thereto will be suppressed.

## IV. CONCLUSION

For the foregoing reasons, Wright's Motion to Suppress, Doc. #52, is OVERRULED. All evidence (statements, documents and other information) obtained by the IRS during its civil audit of B&P and criminal investigation as to Wright and his related entities may be used against him at trial.

Date: October 10, 2017

WALTER H. RICE
UNITED STATES DISTRICT JUDGE